Kelly BROUSSARD, Jim Stephens, Mark Zuckerman, Arnold Fischthal, John Hagar, Sal Lobello, Vincent Matera, Denis and Mary Ann Wickham, Ralph Yarusso and Kenex Corp., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MEINEKE DISCOUNT MUFFLER SHOPS, INC., New Horizons Advertising, Inc., GKN Parts Industries Corp., GKN PLC, Ronald Smythe, Gene Zhiss and Ted Pearce, Defendants.

No. 3:94CV255–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 6, 1997.

Thomas J. Ashcraft, Charlotte, NC, James J. McCabe, Wayne A. Mack, Jr., John J. Soroko, Mark B. Schoeller, Christopher J. Boccaccio, Duane, Morris & Heckscher, Philadelphia, PA, for plaintiffs.

Catherine E. Thompson, E. Osborne Ayscue, Jr., Smith, Helms, Mulliss & Moore, Fred T. Lowrance, I. Faison Hicks, Parker, Poe, Adams & Bernstein, Charlotte, NC, Victor S. Friedman, Fried, Frank, Harris, Shriver & Jacobson, New York City, John F. Dienelt, Erik B. Wulff, Ellen R. Lokker, Hogan & Hartson, L.L.P., Washington, DC, for Meineke Discount Muffler Shops, Inc., New Horizon Advertising Inc., GKN Parts Industries, PLC, Gene Zhiss, Ted Pearce.

Catherine E. Thompson, E. Osborne Ayscue, Jr., Smith, Helms, Mulliss & Moore, Fred T. Lowrance, I. Faison Hicks, Parker, Poe, Adams & Bernstein, Charlotte, NC, Michael Kuhn, Bracewell & Patterson, Houston, TX, Victor S. Friedman, Fried, Frank, Harris, Shriver & Jacobson, New York City, John F. Dienelt, Erik B. Wulff, Ellen R. Lokker, Hogan & Hartson, L.L.P., Washington, DC, for GKN.

Catherine E. Thompson, E. Osborne Ayscue, Jr., Smith, Helms, Mulliss & Moore, Charles E. Lyons, DeLaney and Sellers, P.A., Charlotte, NC, for Michigan Franchisees.

Thomas J. Ashcraft, Charlotte, NC, James J. McCabe, Duane, Morris & Heckscher, Philadelphia, PA, for Ralph Yarusso.

### MEMORANDUM OF DECISION

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on the Plaintiffs' motion for entry of final judgment.

For the reasons stated herein, that motion will be granted and the Court will direct the Clerk to enter a final judgment.[1]

The background for this case is set forth extensively in the Court's rulings on the parties cross-motions for summary judgment and it will not be repeated here. For the purposes of this Order, it suffices to say that the above-captioned case was filed by Meineke's franchisees; in their complaint they alleged, among other things, that under the terms of their Franchise and Trademark Agreements (FTAs) Meineke was obliged to purchase and place advertising for its franchisees in exchange for their franchise fees; they also alleged that Meineke breached the FTAs and their fiduciary duty to the franchisees, committed civil fraud and other torts when it created a wholly-owned subsidiary "New Horizons" to perform these tasks and took additional fees and commissions from the Weekly Advertising Account (WAC), negotiated volume discounts for advertising and took those discounts for itself, purchased superfluous advertising so fees could be charged against the fund, and used the WAC funds for other improper purposes such as settling a lawsuit, paying some of Meineke's business expenses and using WAC funds to advertise to attract franchisees (as opposed to generating business for existing franchisees).

The case was tried during this Court's Civil Jury Term beginning November 6, 1996 and culminated with a jury verdict on December 18, 1996. Ultimately, the jury found the Defendants liable to the Plaintiff class for breach of contract, breach of fiduciary duty, fraud, and various other torts; it awarded damages on a class-wide basis; but it also held that certain releases procured by the Defendants were not procured by fraud, duress, or undue influence. Shortly after the jury rendered its verdict, the Plaintiffs asked the Court to enter final judgment in this case and the Court directed the parties to brief the various post-trial issues that remained outstanding. The briefing is now completed and the Court is prepared to address the issues presented by the parties.

The thrust of the Plaintiffs' briefing is simple. This Court has held a seven week trial in which the Plaintiffs presented their claims to the jury, the jury has returned a verdict that found the Defendants liable for all but one of the claims advanced at trial, and they have determined the damage caused by the Defendants' wrongdoing. According to the Plaintiffs, all that remains is for the Court to decide the various legal issues relating to the scope of the releases procured by the Defendants, issues which the Court reserved for consideration after the verdict, and provide a formula for the allocation of damages to class members, issues that can be readily addressed by the Court or a special master. The Plaintiffs believe that these remaining issues are administrative in nature and merely designed to ensure that the form of the judgment reflects the jury's decision on the merits. Therefore, they assert, the Court has all that is required to enter a final judgment.

The Defendants disagree. According to the Defendants there are several steps that the Court must take before it can render a final judgment. Their arguments are grouped under general headings as follows. The Defendants' first set of arguments center on their contention that the form of the jury verdict prevents the Court from entering a final judgment. Here, the Defendants argue that the Court has yet to resolve certain release issues before it, and they argue that until those release issues are resolved no judgment can enter. Similarly, they claim that the jury's failure to allocate damages among class members, Defendants or claims prevents the entry of judgment. They also argue that no judgment can issue before the claims are reduced by the value of consideration given for certain releases executed by class members. And they maintain that before any judgment can issue the Court must deduct the interest component of damages awarded by the jury and award prejudgment interest under N.C.G.S. § 24–5.

The Defendants' second group of arguments center on the Plaintiffs' claim for damages under North Carolina's Unfair Trade

---

1. The Court has endeavored to rule on these motions quickly, but it notes that the recent flurry of last-minute "letter-briefing" initiated by the Defendants caused significant delay.

Practices Act, N.C.G.S. 75–1.1 *et seq.* Here, they argue again that the Court cannot enter a judgment because the interest awarded by the jury must be considered an award of prejudgment interest and prejudgment interest cannot be trebled under § 75–1.1.[2] Here again they argue that the jury's failure to allocate damages among Defendants and claims precludes an award of damages pursuant to the Act. They also argue that the Court cannot enter a judgment for violation of the Act because Plaintiffs must allocate claims between the Texas and North Carolina Unfair and Deceptive Trade Practices Act. According to the Defendants, the Plaintiffs must allocate claims between the two Acts and that allocation has important consequences in this case because the Plaintiffs are entitled to treble damages under the North Carolina Act but only compensatory damages under the Texas Act. Only when the claims are allocated between the two Acts will it be possible to enter a judgment on these claims.

The Defendants' third group of objections center on the election of remedies. Here, the Defendants argue that the Plaintiffs must choose between punitive and treble damages before any judgment can enter. And they also assert that the Plaintiffs must elect between inconsistent theories of relief (*e.g.,* piercing the corporate veil and aiding and abetting) before judgment can enter.

The final set of objections concerns the Plaintiffs' request for injunctive relief. At root the Defendants assert that the Plaintiffs are not entitled to a permanent injunction under the applicable legal test—in particular because they can always sue again at a later date to recover damages. In the alternative the Defendants argue that any injunction must be narrowly tailored to reflect claims that have been waived as a result of various releases as well as new provisions contained in FTAs executed after March of 1995 and the injunction would have to respect Meineke's right to offer new contractual arrangements. The Court addresses each of

the issues below noting only those facts relevant to its decision.

## I. *FORM OF THE VERDICT*

As noted earlier, the Defendants offer several arguments designed to show that the form of the jury verdict prevents the Court from entering a final judgment. Here, the Defendants argue that the Court has yet to resolve certain release issues before the Court, and they argue that until those release issues are resolved no judgment can enter. Similarly, the jury's failure to allocate damages among class members, Defendants or claims prevents the entry of judgment. They also argue that no judgment can issue before the claims are reduced by the value of consideration given for certain releases executed by class members. And they argue that before any judgment can issue the Court must deduct the interest component of damages awarded by the jury and award prejudgment interest under N.C.G.S. § 24–5.

### A. *Release Issues*

The dispute between the parties between the legal affect of the releases offered by the Defendants as a defense to the claims of certain class members have an impact on many of the issues raised in the post-trial briefing and therefore the Court will address these issues first. By way of background the Court notes that in their answer and at trial the Defendants offered certain releases as an affirmative defense to claims advanced on behalf of certain class members. The briefing of the parties indicates that these releases fall into two categories: (1) releases executed in connection with Meineke's "Enhanced Dealer Program" ("EDP") and (2) releases executed in the ordinary course of business pursuant to the franchise agreements when a franchise was terminated or renewed (referred to herein as the "non-EDP" releases). On the cross-motions for summary judgment, the Plaintiffs argued that these releases were unenforceable because they had been procured by fraud, duress, or undue influence and the Court ruled

---

**2.** They also argue that there was no violation of the Act. But the Court disagrees for the reasons

given *infra.*

that the Plaintiffs had produced sufficient evidence to go to the jury on these issues.[3] During the course of the trial, it became evident that the parties also disagreed over the precise scope of the releases and the Court reserved legal issues arising from disputes about the scope of releases for resolution at post-trial proceedings. Ultimately, the jury rejected the Plaintiffs' contention that the releases obtained by Meineke were procured by fraud, duress, and undue influence. As a result of this jury determination, the release issues raised by the parties are now before the Court.

 The parties have not quibbled about the legal principles governing the interpretation of the releases for good reason: the relevant inquiries implicate well-settled principles of law. Here, the Court notes that the releases are contractual agreements between the parties and, as such, the Court's job is to determine the intent of the parties. The language of the agreement between the parties embodies that intent, and where that language is unambiguous, the written agreement controls. An agreement is ambiguous when it is susceptible to two reasonable interpretations, and the question of ambiguity is one for the Court. If the releases are ambiguous then they must be construed against the drafter. With these background principles in mind, the Court believes that none of the releases at issue are ambiguous and that the results set forth below are plainly required by the language of the relevant agreements.

### 1. *EDP Releases.*

Meineke argues that the EDP releases bar any claim advanced on behalf of class members (about half the class) who executed such releases. The pertinent parts of the EDP release provide:

\* \* \* \* \* \*

5. If Meineke determined that a sufficient number of Meineke franchisees sign this Program Agreement and attached Contract Addendum, then Meineke will reduce the now current advertising fees of New Horizons Advertising Agency, Inc. ("New Horizons") in the manner provided in the Meineke Dealer Enhancement Program. If Meineke elects not to implement the changes to New Horizons then Franchisee shall have the right to cancel this Agreement and the Contract Addendum in the manner described in paragraph 11 of this Agreement, but Franchisee shall have no further rights arising from such election.

\* \* \*. \* \* \*

9. Excluding all obligations created by this Program Agreement and the attached Meineke Contract Addendum and the ongoing obligations of the Meineke Franchise and Trademark Agreement for the shop that is the subject of this Agreement, Franchisee, its stockholders, officers, directors, partners, representatives, heirs, executors, administrators, successors and assigns as the case may be, hereby release Meineke Discount Muffler Shops, Inc., and its parent, subsidiaries, affiliates, and all of their officers, directors, employees, agents, representatives, successors and assigns of and from any and all rights, duties, responsibilities, claims, or causes of action whatsoever, whether in contract or in tort, existing by common law or by statute, known or unknown heretofore existing between the released parties and Franchisee which may have accrued or which may accrue on account of, arising from or in any manner growing out of or resulting from the franchise relationship and the Meineke Franchise and Trademark Agreement governing that relationship, including, but not limited to, the claims alleged in that one certain cause of action entitled *Broussard, et al. v. Meineke Discount Muffler Shops,*

---

**3.** Basically the Plaintiffs argued that the releases were procured by fraud because they excluded "ongoing obligations" which led the franchisees to believe the releases excluded the obligation to purchase and place advertising under the FTAs, and because executing class members could not have known that Meineke was purchasing adver-

tising based on whether it produced higher fees for Meineke as opposed to sales success; and they argued that the release was procured by duress and undue influence because Meineke used its superior position to coerce the franchisees into accepting the program on a take-it-or-leave-it basis within a 30-day period.

*Inc.,* Civil Action Cause No. 3:94–CV–255 (the "Litigation"); on file in the United States District Court for the Western District of North Carolina, Charlotte Division, and any claims similar thereto.

10. If Franchisee is named plaintiff in the Litigation upon signing this Agreement he shall dismiss his claims with prejudice and withdraw from the Litigation. If the Franchisee is not a plaintiff in the Litigation then upon signing the Agreement he will decline to be a plaintiff or a class member of the Litigation.

11. Under the terms of the Enhanced Dealer Program, if a sufficient number of dealers do not subscribe to the Program Agreement then at Meineke's discretion it may elect not to implement the fee reductions of New Horizons described in the Program. Meineke will notify Franchisee within 45 days of his receipt of this Program Agreement whether it plans to implement the changes to New Horizons. If Meineke elects not to implement the changes to New Horizons then Franchisee shall have a right to cancel the Program Agreement and Meineke Contract Agreement by giving to Meineke written notice within 14 days from the date that Meineke announces its decision not to implement the changes to New Horizons. If Franchisee elects to cancel this Program Agreement and the Meineke Contract Addendum, Franchisee shall continue to enjoy all of the privileges and benefits of the Meineke franchise system with the exception of those enhancements listed in this Program Agreement and the Contract Addendum. If Franchisee elects to rescind his Program Agreement, he shall not be required to repay to Meineke the royalty reduction he has enjoyed from the time he signed the Program Agreement through the date of his cancellation.

\* \* \* \* \* \*

17. This Program Agreement and its attachments constitute the entire Agreement between the Parties relative to the subject matter contained herein, and all prior understandings, representations and agreements made by and between the Parties relative to the contents contained in this Agreement are merged into this Agreement. Nothing in this paragraph shall act to cancel or be used to avoid any of the ongoing obligations contained in the Meineke Franchise and Trademark Agreement except as modified by this Agreement and the Meineke Contract Addendum.

According to the Defendants, these provisions clearly release all of the Defendants in this suit from all of the claims advanced on behalf of the class who signed EDP releases.

In response, the Plaintiffs argue that the EDP releases do not bar the recovery of class members for certain types of claims advanced in this case and do not bar any claim against Defendant GKN. First, the Plaintiffs note that the EDP releases excluded "the ongoing obligations of the Meineke Franchise and Trademark Agreement" and argue that since the obligation to purchase and place advertising arose from the Franchise Agreement, the EDP releases do not affect the ability of class members executing the release to recover on their claims that Meineke breached its contractual duty to purchase and place advertising. The Plaintiffs also argue that the releases do not extend to claims against GKN. Here, the Plaintiffs note that the EDP releases only cover claims against Meineke "its parent, subsidiaries, affiliates, and all officers, directors, employees, agents, representatives, successors and assigns." Relying on *Glenn v. Wagner,* 67 N.C.App. 563, 575–76 & n. 3, 313 S.E.2d 832 (1984), *rev'd on other grounds,* 313 N.C. 450, 329 S.E.2d 326 (1985), the Plaintiffs argue that GKN is not an affiliate within the meaning of that case because two corporations are affiliates only when the controlling interest in each corporation is owned by the same person or the same corporation. The relationship between GKN and Meineke does not fit this definition, they argue, and therefore GKN is not an affiliate of Meineke within the meaning of the release. Finally, the Plaintiffs rely on the "ongoing obligations" language of the EDP release to argue that the EDP releases do not release claims for damage caused by any misappropriation of WAC funds occurring

after January of 1995, the date when the releases were executed.

The Court disagrees with the Plaintiffs. As the Defendants point out, in ¶ 9 of the release the franchisee released "all claims alleged" in this case and "any claims similar thereto", the releases specifically reference the case by name, and ¶ 10 obliges the franchisee to withdraw from, or decline to be a plaintiff or class member of, the class action. In addition, ¶ 5 of the agreement specifically provides that Meineke will reduce the fees New Horizons charged to purchase and place advertising if a "sufficient" number of franchisees sign the Program Agreement and attached contract addendum, and that addendum adjusts certain provisions of the Franchise Agreements pursuant to the EDP program. Indeed, ¶ 17 specifically states that nothing in the EDP's integration clause "shall act to cancel or be used to avoid any of the ongoing obligations contained in the Meineke FTA *except as modified by this Agreement **and** the Meineke Contract Addendum.*"

■ Given these provisions waiving all claims advanced in this suit and clearly contemplating that New Horizons will continue to receive fees (albeit reduced fees) for the purchase and placement of advertising, the Plaintiffs' assertion that the "[e]xcluding ... all obligations of the Meineke Franchise and Trademark Agreement" language in ¶ 9 excludes claims for breach of contract based on Meineke's payment of commissions to New Horizons for the purchase and placement of advertising is untenable. Thus, the Court concludes that when the agreement is read as a whole, it is susceptible to only one reasonable interpretation: the franchisee waives the claims advanced against Meineke—including the claim that Meineke breached the agreement by creating New Horizons to provide advertising services it was already obliged to provide in exchange for the franchisee fees in order to skim fees from the WAC fund—in exchange for the promise that New Horizons would charge reduced fees for those services and the other consideration set forth in the release.

■ For a similar reason, the Court agrees with the Defendants that the EDP releases extend to, and release, claims advanced against GKN. Even assuming that the Plaintiffs reading of *Glenn, supra,* was not strained, the common meaning of the term "affiliate" is much broader. For example, Webster's defines affiliate as "a company effectively controlled by another *or associated with others under common ownership or control.*" [4] Black's Law Dictionary states that affiliate "[s]ignifies a condition of being united; being in close connection, allied, associated, or attached as a member or branch." [5] GKN is an affiliate of Meineke under both these definitions, there is no indication that the parties sought to use a narrow, technical definition of the term in the release, and any effort to read the term affiliate so narrowly is unreasonable given the manifest purpose of the release as evidenced in its provisions. For these reasons, the Court concludes that when the agreements are read as a whole and placed in context the agreement is susceptible to only one reasonable interpretation—and that interpretation gives the term "affiliate" its general and broad meaning, a meaning which indicates that those class members who executed EDP releases relinquished their claims against GKN when they released claims against Meineke and its affiliates.

■ That leaves the Plaintiffs' claim that the EDP releases do not release claims for misappropriations of WAC funds occurring after January of 1995, the date when the releases were executed. In support of this argument the Plaintiffs rely on *Travis v. Knob Creek, Inc.,* 321 N.C. 279, 362 S.E.2d 277 (1987) where the Court held that a release of "claims" or "demands" refers to then existing or matured causes of action, but did not include those causes of action that had not accrued at that time. *Id.* at 283, 362 S.E.2d 277. The Court does not believe the rule in *Travis, supra,* applies here. As noted earlier, the EDP agreement releases all the claims advanced in this lawsuit and "any claims similar thereto" and it expressly provides that New Horizons will continue to

---

4. Webster's New Collegiate, p. 20 (1977).

5. Black's Law Dictionary, p. 58 (6th Ed.1990).

receive fees for its purchase and placement of advertising. Under these circumstances, the Plaintiffs' argument that the release executed in connection with the EDP program does not include claims for such conduct taking place after January 1995 is unpersuasive. Rather, the Court believes this is a case where the release, when read as a whole, does specifically address future claims. *Cf. Travis*, 321 N.C. at 283, 362 S.E.2d 277 (release did not specifically include future claims).

The Plaintiffs argue that this reading of the EDP release makes no sense because if the exclusion of "ongoing obligations" in ¶ 9 is taken to mean obligations modified by the release itself, there would be no meaning to the exclusion of ongoing obligations under the FTAs from the releases since such obligations would not be "ongoing" but would have been changed by the EDP program. The Court disagrees because many of the obligations created by the FTAs are not modified by the EDP at all and these obligations are ongoing in the strict sense urged by the Plaintiffs. Also it does not necessarily follow, as the Plaintiffs argue, that a modified obligation is not properly characterized as an "ongoing" obligation nonetheless. In the Court's view, ¶ 9 simply and plainly excludes ongoing contract obligations that are not a subject of this suit from the scope of claims released and an ongoing obligation can be modified and yet regarded as ongoing. Despite the Plaintiffs' arguments, ¶ 17 does not require a different result because that paragraph, which is an integration clause, merely states that nothing in the EDP's integration clause "shall act to cancel or be used to avoid any of the ongoing obligations contained in the Meineke FTA *except as modified by this Agreement and the Meineke Contract Addendum.*" Thus, this paragraph clearly indicates that the EDP does modify some obligations created by the FTA—including the royalty and advertising contribution provisions—but leaves other obligations unaffected—therefore this provision supports the Defendants' reading of ¶ 9.

### 2. *Non–EDP Releases.*

The Defendants have also offered releases executed in the ordinary course of business when a franchise was terminated or renewed as a defense to the claims advanced by the Plaintiffs in this case. In pertinent part some of these releases name Meineke and its "affiliates" while other release name Meineke and extend to its "stockholders." So far as the parties have indicated, these releases apply to "any and all claims" "arising out of" the FTAs. According to the Defendants, these releases include all the Defendants and all of the claims advanced in this suit.

The Plaintiffs argue that these releases do not apply to certain claims and parties for several reasons. First, the Plaintiffs note that many of the releases expressly extend to claims against Meineke, other entities and "affiliates" of Meineke, but not GKN. Since GKN is not an affiliate of Meineke within the meaning of *Glenn, supra*, the Plaintiffs argue, claims against GKN are not released thereby. Similarly, the Plaintiffs note that many of these releases only release Meineke and "its officers, directors, stockholders, employees, agents, representatives, successors and assigns ...". GKN is not a stockholder of Meineke, the Plaintiffs note, and as a result these releases do not reach claims against GKN. Finally, the Plaintiffs insist that none of these releases cover claims against Meineke for its wrongful payment of commissions to New Horizons in the period after any release was executed.

■ For the reasons given earlier, the Court cannot accept the Plaintiffs' argument that GKN is not an affiliate of Meineke such that GKN does not fall within the scope of those non-EDP releases which extend to "affiliates" of Meineke. Likewise the Court cannot accept the Plaintiffs assertion that these releases, which extend to "any and all rights, duties, responsibilities, and claims which they have or may have arising out of that certain Franchise and Trademark Agreement", do not extend to tort claims. Although the question is a close one and the Court can find little guidance, it appears that under North Carolina law a general release of any and all "claims" "arising out of" a contract includes claims sounding in tort. *See Colon v. Bailey*, 76 N.C.App. 491, 333 S.E.2d 505 (1985), *rev'd on other grounds*, 316 N.C. 190, 340 S.E.2d 478 (1986) (release

of claims arising from lease barred suit for breach of lease and negligent maintenance of equipment).

■■■■ That leaves the Plaintiffs' contention that GKN does not fall within the scope of those non-EDP releases which extend to claims against Meineke's stockholders. No one disputes that GKN does not hold Meineke stock so there is no reason to believe that GKN falls within the terms of these non-EDP releases. Nonetheless, the Defendants offer a number of arguments designed to show that GKN falls within the scope of these non-EDP releases which name "Meineke ... and its stockholders." Here the Defendants argue that GKN is an "indirect stockholder" of Meineke because GKN owns stock in PIC which is the only stockholder in Meineke. Since Meineke had only one stockholder during the period when these releases were executed, they argue, the Court must read the plural "stockholders" to include "indirect stockholders" so that the plural has meaning. The Defendants also argue that GKN is released under the term "directors" insofar as its liability follows from the actions of GKN officers in their service on Meineke's Board of Directors.

The Court finds these arguments unpersuasive. For one thing, the Court believes that Meineke's effort to read the release language regarding Meineke "stockholders" to include stockholders in stockholders of Meineke is patently unreasonable. It would take much more than a wayward "s" to transform companies which hold no stock in Meineke into stockholders within the plain meaning of that term. The same is true of the Defendants' effort to extend the language releasing claims against "directors" of Meineke to include claims against other corporations those directors might serve; no meaning of director includes the corporation for which the director acts.

■■■■ The Defendants' argument that the non-EDP releases must be deemed to release GKN under the "reverse" alter ego doctrine or the doctrine of judicial estoppel are also misplaced. Here, they argue that because the jury found that GKN was an alter ego of Meineke, the release of Meineke must be deemed to release GKN (as Meineke's alter

ego). And they offer the related argument that the doctrine of judicial estoppel precludes the Plaintiffs from asserting that Meineke and GKN are separate entities within the meaning of the releases given the Plaintiffs' contention that GKN was Meineke's alter ego at trial and the jury's finding to that effect.

The Court believes these arguments are mistaken for at least two reasons. First, the argument is mistaken because it neglects to note that a release is an affirmative defense created by way of contract and therefore confuses the critical inquiry: the intent of the parties when they executed the release. *See Travis v. Knob Creek*, 321 N.C. at 281, 362 S.E.2d 277 (release inquiry focuses on intent of parties). The Plaintiffs maintain that the intent of the parties as reflected in the language of the release clearly indicates that claims against GKN were not released when the term "Meineke" was used and this Court agrees. Indeed, the Defendants have continually denied that GKN is Meineke's alter ego which makes any contention that the parties understood the proper name "Meineke" to include GKN most untenable.

This critical distinction is also at least one reason why the doctrine of judicial estoppel could never apply here because the positions of the Plaintiffs are not inconsistent. On the one hand the Plaintiffs maintain that the intent of the parties reflected in the releases clearly indicates that the release did not extend to claims against GKN; on the other hand they maintain that (as a factual matter) GKN so dominated and manipulated Meineke that it should be liable for Meineke's wrongdoing under the alter ego doctrine. The Court finds no contradiction.

Finally, the Court also agrees that the Defendants' reliance on the legal effect of the alter ego doctrine is also mistaken because it turns the rule against its purpose: "to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326 (1985). As the North Carolina Supreme Court explained in *Glenn, supra:* "[it] should be remembered that the theory of liability under the instrumentality rule is an equitable doctrine ... [i]ts purpose is to place the

burden of the loss upon the party who should be responsible." *Glenn,* 313 N.C. at 458, 329 S.E.2d 326. Given the purpose of the alter ego doctrine as articulated by the courts of North Carolina—to remove the protection from liability afforded by the corporate form when that form has been used as an instrument of wrong-doing—this Court believes that the Supreme Court of North Carolina would not allow the doctrine to be used to perpetuate such wrongdoing and therefore it would agree with those courts holding that the alter ego doctrine is a sword but not a shield from liability. *See also Lumpkin v. Envirodyne Indus.,* 933 F.2d 449, 460 (7th Cir.1991). Such a use of the alter ego doctrine would not be "reverse", it would be backwards.[6]

That leaves the Plaintiffs contentions that none of these non-EDP releases concern claims for the misappropriation of WAC funds occurring after the releases were executed. Initially it seemed that the Defendants disputed this assertion, but at the hearing in this matter the Defendants disavowed any such position. The Court believes that these releases clearly do not release claims for misappropriations of WAC funds occurring after the releases were executed under the rule in *Travis v. Knob Creek, Inc.,* 321 N.C. 279, 281, 362 S.E.2d 277 (1987).

Thus far then the release issues presented by the parties have been resolved as follows. EDP Releases: (1) release GKN as an "affiliate" of Meineke and (2) extend to all claims for class members arising from the taking of commissions from WAC funds by Meineke/New Horizons—including contract claims as well as future claims for such conduct. Non–EDP releases: (1) release GKN where the term "affiliate" is used, (2) do not release GKN where the term "stockholders" is used, and (3) do not release any claims of class members for taking of commissions from WAC funds etc. occurring after the release was executed. The judgment entered by the Court will indicate that the jury award for damages will be adjusted to deduct the value of those claims once that value has been determined using the allocation formula approved by the Court.

### 3. *Release Issues Relevant to the Plaintiffs' Request for Equitable Relief.*

■ As explained further below, the Court believes that injunctive relief is appropriate in this case and intends to issue an injunction consistent with the release determinations set forth above. For that reason, the Court notes that the injunction will not extend to the taking of fees calculated on the advertising contributions of class members who have executed EDP releases. In addition, the Court will not extend the injunction to prohibit the taking of fees calculated on advertising contributions of franchisees who have executed FTAs since March of 1995. As the Defendants note, sections 3.1(d) and 7.17(b) of FTAs executed after March 1995 expressly provide that advertising contributions shall also be used to "pay fees or other charges assessed by any advertising agency as Meineke may designate for the placement of such advertisements, whether the advertising agency is in-house or otherwise." Under these circumstances, the Court will not enjoin Meineke from charging fees for the purchase or placement of advertising insofar as those fees are calculated from the advertising contributions of such franchisees.

The Plaintiffs argue that the Defendants made no effort to distinguish these post-March 1995 FTAs from other FTAs during the trial such that the jury's finding that Meineke breached its contracts with class members extends to these FTAs. Although this argument has merit, the Court believes it is not bound by the jury findings for the purpose of determining whether injunctive relief is appropriate, and given these provisions the Court does not believe that the Plaintiffs are entitled to an injunction preventing Meineke from paying fees to New Horizon for its purchase and placement of advertising to the extent that those fees are calculated based on the expenditure of WAC

---

6. For this reason, the cases cited by the Defendants do not support their efforts here. In those cases, courts allow piercing in an effort to remedy abuse of the corporate form, not to perpetuate the abuse; and in other cases the courts appear to apply the doctrine of judicial estoppel—which does not apply here for the reasons given above.

contributions of franchisees under the post-March 1995 FTA. That FTA plainly authorizes Meineke to "pay fees or other charges assessed by any advertising agency as Meineke may designate for the placement of such advertisements, whether the advertising agency is in-house or otherwise" a provision which plainly authorizes Meineke's payment of fees taken from WAC funds to New Horizons whether that subsidiary is characterized as an in-house or out-house advertising agency.

### 4. *Miscellaneous Release Issues.*

■ The Defendants have also brought a number of miscellaneous release issues to the attention of the Court. The Court agrees with the Defendants on a great many of these issues and believes that there is no genuine dispute concerning their proper resolution. Therefore, the Court rules as follows. First, the Defendants have indicated that some releases have been signed by some (but not all) of the partners of a partnership that owns a franchise or signed by one (but not all) of the co-owners of a franchise; the Court finds these releases are binding on all the partners under well-settled agency principles.

■ The Defendants have raised concerns about EDP releases signed after class certification. Given the jury's findings that the releases were not procured by fraud, duress, or undue influence the Court will enforce these releases.

■ The Defendants have also indicated that there are approximately 40 class members who have accepted the benefits of the EDP program although there is no completed release in evidence because Meineke either did not have a fully executed release in its files or simply had no release in its files. According to the Defendants, these cases represent a classic example of agreement by the accepting of benefits under a contract. The Court agrees. The evidence at trial showed that Meineke directed a substantial mailing campaign towards its franchisees urging them to sign up for the EDP program around the time that the class was certified. Given that massive mailing campaign detailing the benefits of the EDP program, the Court agrees that any member who accepted *the benefits of the EDP program specific to franchisees who joined that program* would be estopped from denying the contract, including the mutual release it entailed. Therefore, in those cases where Meineke can show that these class members received the benefits of the EDP program, including the "Pipedream" computer system described in ¶ 2 of the EDP program as well as the benefits set forth in the contract addendum that accompanied the EDP program, those class members will be bound by the release called for by the EDP program.

■ Similarly, the Defendants have noted there are a few cases where class members signed releases, but Meineke never completely executed the document. According to the Defendants these releases were executed in connection with agreements between the parties. And under these circumstances, the Court believes that execution by Meineke is a mere formality and, given the signature of the party against whom the release is to be enforced, the Court finds that such releases are valid.

■ Finally, the Defendants note that there are some releases which do not contain the term "affiliate" but which were executed pursuant to a version of the FTAs which requires the franchisee to release affiliates. The Court does not believe that the Defendants can rewrite the releases to include "affiliates" on the basis of the FTA provision. Even assuming that these agreements must be read together, as the Defendants' argument intimates, there is an irreconcilable conflict between the two provisions: the FTA anticipates a release of affiliates, but the releases fail to do so. No amount of reasonable "construction" can harmonize this direct conflict, and under these circumstances the narrow language of the releases must govern because releases are construed narrowly and, like any other contract, they are construed against the drafter in cases like this one. *See e.g. Sanus v. Dube–Seybold–Sutherland,* 837 S.W.2d 191, 196–97 (Tex.App.1992) (although settlement and release contains broad language in referring to the assignment, court must look at the actual assignment itself in determining rights and must con-

strue the general categorical release clauses narrowly); *Manzo v. Ford*, 731 S.W.2d 673 (Tex.App.1987) (rule that writing is construed most strictly against its author is particularly appropriate where the agreement purports to release the drafter from liability); *Baxley v. Nationwide*, 334 N.C. 1, 430 S.E.2d 895 (1993) (construe contract against drafter).

### 5. *Contribution Issues.*

The Defendants have also argued that the Court cannot enter judgment by reason of the Uniform Contribution Among Tort–Feasors Act. N.C.G.S. § 1B–4. Here, they argue that in the event that any releases are effective as to certain Defendants but ineffective as to other Defendants the Act would entitle the Defendants to a reduction in the claims against them to the extent of the amount of consideration paid for the release.[7] The determination of that amount, on a class member by class member basis, they argue, will likely involve disputed issues of material fact, as to which parties have the right to trial by jury.

 The Court disagrees. Section 1B–4 operates to prevent a double recovery just like the common-law doctrine of election of remedies, *see United Laboratories v. Kuykendall*, 335 N.C. 183, 191–92, 437 S.E.2d 374 (1993) (one function of doctrine of election of remedies is to prevent a double recovery for a single wrong); and where one seeks to avoid double recovery based on matters outside the pleadings those matters must be pled as an affirmative defense and

proved at trial or the defense is waived. *See North Carolina Federal Savings v. Ray*, 95 N.C.App. 317, 321–24, 382 S.E.2d 851 (1989) (election of remedies is an affirmative defense that is waived if it is not pleaded). The Defendants did not plead the statutory right as an affirmative defense and they cannot raise it now in order to secure a reduction in damages. Similarly, the Defendants presented no evidence on this issue at trial and did not request any instruction on the point—yet another reason why the Court believes that this issue has been waived. In short, the Court denied the Defendants' motion to bifurcate the case so that release and other issues would be tried separately and the Defendants' failure to raise this issue at trial is no reason to try these issues now after the jury has rendered its verdict on damages.[8]

 For this same reason, the Court finds that the Defendants are not entitled to offset any prior judgments secured against class members against their share, if any, in the damages awarded by the jury. The Defendants never raised these judgments in their pleadings or at trial such that the issue is not properly before the Court. Under these circumstances, Meineke must execute on whatever judgments it has obtained against these class members when they receive their damage awards; it cannot introduce a new counter-claim or affirmative defense at this late date. Likewise the Court finds that it is too late for Meineke to ask this Court to decide "whether prior judg-

7. Thus, as the Defendants recognize, this issue is only relevant as to those releases that do not release all the Defendants, such as non-EDP releases that limit the release to Meineke and its stockholders.

8. The Defendants also rely on the Uniform Contribution Among Tortfeasors Act as enacted in Texas, citing Tex.Civ.Prac. & Rem.Code Ann. § 33.012, but the Court believes that this Act does not govern a judgment rendered by a North Carolina court, see N.C.G.S. § 1B–7, and therefore would not govern a federal court judgment rendered under North Carolina law. The Court has noted that the contribution act does not give joint tort-feasors a right to contribution in cases of fraud or breach of fiduciary duty. See N.C.G.S. 1B–1(g). The Defendants rely on this section to argue that if the Act does not apply,

then the common-law rule that the release of one tort-feasor releases all tort-feasors will apply and any and all Defendants will have the benefit of any release. While the Defendants' argument comports with the literal terms of the statute, the Court is confident that the policy behind the exception—which is plainly designed to reduce the rights of joint tort-feasors in those cases— compels a different result. Thus, the Court believes that if North Carolina's Supreme Court was asked to reconsider the much criticized common-law rule upon which the Defendants rely, see e.g. Prosser & Keeton, Law of Torts, § 49 (5th Ed.1984), that court would discard the old rule, especially in cases involving claims for fraud or breach of fiduciary duty. *See e.g. Lumpkin*, 933 F.2d at 457 (citing Restatement (Second) of Torts, § 885).

ments (including default judgments) obtained by Meineke against class members release some or all of the Defendants." The short answer to this issue is: no. Judgments do not release anyone; they may sometimes bar claims under the principles of *res judicata*, but *res judicata* is an affirmative defense that must be pleaded by the parties to a suit—which is not the case here—or it is waived. *See e.g., Crowe v. Cherokee Wonderland, Inc.*, 379 F.2d 51 (4th Cir.1967) (defense of *res judicata* is an affirmative defense that must be pleaded affirmatively and it is waived where it is not raised in trial court); *Newman v. Link*, 866 S.W.2d 721, 727 (Tex.App.1993) (same). The Defendants are not free to inject this new defense to the Plaintiffs' damage claims at this stage in the proceeding.

### B. *Failure to Allocate Damages and Prejudgment Interest Issues.*

The Defendants also argue that no final judgment can enter because the jury verdict does not allocate damages. Here, the Defendants note that, as per the Court's instructions, the jury found damages on a class-wide basis and did not make a factual finding concerning a formula to allocate damages among class members. According to the Defendants, the jury's failure to endorse a specific formula for the distribution of damages makes it impossible to allocate its damage award to class members. In addition, the Defendants assert that there can be no final judgment because the jury verdict does not tie its damage award to specific claims (e.g. breach of contract, fraud, etc.) or the individual Defendants. According to the Defendants, the jury's failure to distribute damages among the various claims on which it found for the Plaintiffs means that this Court cannot enter judgment. Finally, the Defendants assert that any judgment must strike the jury's award of interest damages and calculate prejudgment interest pursuant to N.C.G.S. § 24–5.

 The Court disagrees that any of these difficulties preclude the entering of judgment. For one thing, the Court believes it is too late for the Defendants to argue that

the jury should have made their damage determination in the form of a formula because the Defendants never requested such an instruction at trial. The Court also believes that in the class action context it can provide for the allocation of damages based on a formula determined by the Court provided that formula provides a reasonable basis for the calculation of damages once the jury has returned a damage verdict. *See* H. Newberg & A. Conte, Newberg on Class Actions, § 10–12 at 10–31 to 10–33. In this regard, the Court believes that the formula submitted by the Plaintiffs provides a wholly reasonable basis for the allocation of damages and therefore it will employ that formula. In addition, the Court finds that no individualized proof of claim procedure is required because the evidence at trial and the post-verdict proceedings establish that damages can be allocated according to the formula adopted by the Court pursuant to information in the Defendants' records. The Court will appoint a special master to supervise this process.

 For several reasons, the Court does not agree with the Defendants' assertion that there can be no judgment because the jury verdict does not allocate damages among various claims and does not assign damage subtotals to individual Defendants. For one thing, the Court recalls no evidence at trial that would have supported such an effort to allocate damages among claims or defendants. Throughout the trial the Defendants, who were all represented by the same attorneys, made no effort to apportion damages among themselves or among their various activities; and they never attempted to attribute damages to specific wrongful acts. Instead the Defendants presented a united front which consisted in denying liability altogether and insisting that the FTAs permitted their conduct. The jury found that defense unpersuasive, but that does not mean the Defendants can now argue that the jury should have been instructed on a defense theory that was not advanced during the trial or that the Defendants can advance a new theory of defense after the verdict.[9]

---

9. The Defendants argue that the jury's findings on the unjust enrichment count show that differ-

Also, as the Plaintiffs note, the jury verdict indicates that there will be joint and several liability on any claim where they can collect damages, the jury found that the Defendants aided and abetted each other with respect to Meineke's breach of fiduciary duty, and it found that the Defendants were corporate alter egos such that they are properly treated as one entity for the purpose of determining liability. Under these circumstances there is no need to allocate damages among claims or Defendants and the Defendants' concern about the failure to allocate damages among individual claims and Defendants seems most misplaced.

The Defendants also argue that the Court must strike that portion of the jury verdict attributed to interest and allow for prejudgment interest as provided by N.C.G.S. § 24–5. Here, the Defendants argue that the jury award of interest is an award of prejudgment interest which must be awarded by the Court pursuant to § 24–5. Again the Court disagrees because nothing in N.C.G.S. § 24–5 precludes the award of interest damages when those damages are recoverable under ordinary damage principles as a natural and foreseeable consequence of wrongdoing or damages within the contemplation of the parties as a probable result of their wrongdoing. *See Pipkin v. Thomas & Hill,* 298 N.C. 278, 284–86, 258 S.E.2d 778 (1979) (plaintiff could recover interest damages caused by breach of contract to lend); *Quate v. Caudle,* 95 N.C.App. 80, 381 S.E.2d 842, *rev. den.,* 325 N.C. 709, 388 S.E.2d 462 (1989) (same), *Sherrill White Construction v. S.C. National Bank,* 713 F.2d 1047, 1052 (4th Cir.1983) (in action against bank for conversion of draw checks interest damages could be recovered as damages); *Aetna Casualty v. Hepler State Bank,* 6 Kan.App.2d 543, 630 P.2d 721, 729 (1981) (in case of conversion interest is allowed by way of damages and "[t]he allowance is not dependent on statute ... but is merely designed to make the plaintiff whole").

[31] In this case the Plaintiffs presented evidence that the WAC fund was a trust fund that was supposed to be kept in a separate account and managed for the benefit of the franchisees. But the Plaintiffs also presented evidence that Meineke managed the account for its own benefit by, among other things, sweeping WAC funds into Meineke accounts so that Meineke earned interest at the expense of the WAC fund as well as by withdrawing funds from the WAC account to settle lawsuits and using the money to pay some of Meineke's corporate expenses, purchasing superfluous advertising for the sake of generating commissions, negotiating volume discounts for advertising but keeping those discounts for its benefit while charging the full price to the WAC fund, and using WAC funds to attract new franchisees as opposed to generating business for existing franchisees. It was because of this evidence that the Court determined that the Plaintiffs were entitled to seek damages based on lost interest and to present that issue to the jury. The Court is confident that this evidence supports the jury's finding that Meineke's manipulation of the WAC fund—as found by the jury—caused damages in the form of lost interest which are recoverable under the principles governing the recovery of damages in general.

Thus, the Court believes that the Defendants' reliance on N.C.G.S. § 24–5 is mistaken because there is no indication that § 24–5 is designed to cap or otherwise diminish damages based on lost interest where, as here, those damages are recoverable under ordinary damage principles. Quite the contrary, the statute is designed to allow the recovery of interest damages when such damages would not be available under ordinary damage principles. *See e.g. Baxley v. Nationwide Mutual Ins. Co.,* 334 N.C. 1, 430 S.E.2d 895 (1993) (§ 24–5(b) is designed to change common-law rule that judgment did not carry interest on it).[10] Under the Defendants' reading of § 24–5 an employer who

---

ent damages could flow from different wrongs. The Court fails to see how that is relevant. The Court instructed the jury on this issue, at the Plaintiffs' request, because the Plaintiffs had submitted evidence that supported such an instruction.

10. In this case, the Plaintiffs proved their interest damages up to the time of trial and therefore the Court will limit the recovery of prejudgment interest under N.C.G.S. § 24–5 to the period beginning from the verdict through the Judgment.

had directed its employee to deposit a principal sum so that it could earn interest at 20%, upon learning that the employee had misappropriated the money and deposited it in his own account where it earned interest at 20% for ten years, would be limited to recovering as money damages the principal and only that interest which would be allowed as prejudgment interest under § 24–5, and only interest accruing from the "trigger" specified in the statute. The Court does not believe that § 24–5 was intended to produce, or requires, such a result. In fact, by arguing that any award of interest is covered by N.C.G.S. § 24–5, the Defendants are making the very argument that was rejected in *Quate, supra.*

## II. *UNFAIR TRADE PRACTICES ACT ISSUES*

The Defendants' second group of arguments center on the Plaintiffs claim for damages under North Carolina's Unfair and Deceptive Trade Practices Act ("DTPA"), N.C.G.S. § 75–1.1 *et seq.* Here, they argue again that the Court cannot enter a judgment because the interest awarded by the jury must be considered an award of prejudgment interest and prejudgment interest cannot be trebled under § 75–1.1. Here again they argue that the jury's failure to allocate damages among Defendants and claims precludes an award of damages pursuant to the Act. They also argue that the Court cannot enter a judgment for violation of the Act because Plaintiffs must allocate

claims between the Texas and North Carolina Acts. According to the Defendants the Plaintiffs must allocate claims between the two Acts and that allocation has important consequences in this case because the Plaintiffs are entitled to treble damages under the North Carolina Act but only compensatory damages under the Texas Act (because the Plaintiffs did not secure a separate jury determination that the acts which violated the Texas Act justified the imposition of exemplary damages). Only when the claims are allocated between the two Acts will it be possible to enter a judgment on these claims.

### A. *Interest and Allocation Issues.*

For the reasons given above, the Court believes that the jury's failure to allocate damages among Defendants or the failure to assign damages to various factual predicates alleged by the jury is immaterial. The Defendants' evidence at trial provided no basis for any such instructions and the Defendants did not request such instructions at trial, the Defendants are jointly and severally liable on this count of the complaint, and all of the factual predicates are well supported by the evidence so the award of damages *en gross* is appropriate. And as noted earlier, the Court believes that in this case the lost interest suffered by the Plaintiffs was recoverable under general damage principals and is not limited by § 24–5. *See Quate v. Caudle,* 95 N.C.App. at 87–88, 381 S.E.2d 842 (trebling interest damages).[11]

---

11. In addition, even if the award of interest was somehow characterized as prejudgment interest governed by statute—which it is not—the Court believes it would be properly trebled under § 75–16. After a lengthy consideration of the statute the North Carolina Supreme Court has concluded that prejudgment interest under § 24–5 is properly characterized as compensatory damages, *see Baxley v. Nationwide,* 334 N.C. at 5–11, 430 S.E.2d 895 (because legislature considered prejudgment interest to be in the nature of compensatory damages, prejudgment interest is damages within meaning of insurance policy); and if such interest is properly characterized as compensatory damages it should be trebled under § 75–16. Here, the Court agrees with the Plaintiffs that this result is implied by the North Carolina Supreme Court's holding in *Custom Molders, Inc. v. American Yard Products, Inc.,* 342 N.C. 133, 463 S.E.2d 199 (1995). In that case the North Carolina Supreme Court disavowed

the decision in *Love v. Keith,* 95 N.C.App. 549, 383 S.E.2d 674 (1989) where the Court of Appeals reasoned that a plaintiff was not entitled to post-judgment interest on trebled damages because the statutory damages were not compensatory damages and post-judgment interest could only be awarded for compensatory damages. Insofar as prejudgment interest and post-judgment interest share the same purpose—compensating plaintiffs for damages flowing from their status as judgment creditor—it is difficult to see why a different rule would apply to prejudgment and post-judgment interest especially where, as here, prejudgment interest has been characterized as an element of compensatory damages (albeit one that is specifically authorized by statute). Thus, *Custom Molders, supra,* overrules *Love, supra,* and casts doubt upon *Sampson–Bladen Oil Co. v. Walters,* 86 N.C.App. 173, 356 S.E.2d 805 (1987), the cases relied on by the Defendants. For these same reasons, the Court believes that when the

### B. Claims Under North Carolina's DTPA Concerning FTAs Governed by Texas Law.

As noted, the Defendants argue that the Court cannot enter a judgment for violation of the North Carolina DTPA because Plaintiffs must allocate claims between the Texas and North Carolina Unfair and Deceptive Trade Practices Acts. According to the Defendants the Plaintiffs must allocate claims between the two Acts and that allocation has important consequences in this case because the Plaintiffs are entitled to treble damages under the North Carolina Act but only compensatory damages under the Texas Act (because the Plaintiffs did not secure a separate jury determination that the acts which violated the Texas Act justified the imposition of exemplary damages). Only when the claims are allocated between the two Acts will it be possible to enter a judgment on these claims.

The fulcrum for this argument is the Defendants' assertion that the class members must advance claims under the Texas Deceptive Trade Practices Act, instead of the North Carolina Act. Here, the Defendants argued that those franchisees whose contracts contain a Texas choice of law provision had waived their rights to advance claims under North Carolina's DTPA. The Court disagrees. First, Defendants did not raise such an argument based on this choice of law provision prior to the verdict and it is too late for them to complain at this time.[12] Also, in this diversity case the Court must apply the choice of law rules of the forum state and under North Carolina law such contractual choice of law provisions do not govern duties imposed by common-law or statute. *See ITCO v. Michelin Tire*, 722 F.2d 42, 49 n. 11 (4th Cir.1983); *United Virginia Bank v. Air Lift Associates*, 79 N.C.App. 315, 320–21, 339 S.E.2d 90 (1986) (*citing ITCO, supra*, with approval); *United Dominion v. Overhead Door*, 762 F.Supp. 126, 128 (W.D.N.C.1991). Thus this case is governed by North Carolina's DTPA because damages occurred here when, as the jury found, the Defendants misappropriated WAC funds in state, and also because Meineke acted as the agent for class members in this state, this contractual relationship has been centered in this state for ten years, and the North Carolina DTPA expresses North Carolina's interest in policing businesses in this state to ensure that consumers who purchase goods and services in the state are protected from unfair and deceptive trade practices.[13]

### III. ELECTION OF REMEDIES

The Defendants' third group of objections center on the election of remedies. Here, the Defendants argue that the Plaintiffs must choose between punitive and treble damages before any judgment can enter. They also assert that the Plaintiffs must elect between inconsistent theories of relief before judgment can enter.

As noted at the hearing held in this matter, the Court finds that the conduct found by the jury in this case rises to the level of unfair and deceptive trade practices within the meaning of the Act. For example, in this case the Plaintiffs argued that the FTAs obligated Meineke to purchase and place advertising for the franchisees in ex-

---

North Carolina Supreme Court is confronted with this issue it will hold that prejudgment interest awarded pursuant to § 24–5 is properly characterized as "damages" within the meaning of § 75–16 and, as such, is properly trebled. Thus, even if the award of interest in this case was somehow limited by § 24–5, that award would be properly trebled.

**12.** Indeed, the Court's concern was not whether all class members could advance claims under the North Carolina statute, but whether the Plaintiffs had produced evidence sufficient to withstand the Defendants' motion for a directed verdict as to claims advanced under the Texas Act since Meineke had relocated to North Car-

olina law just after the period covered by this suit began.

**13.** The Court also believes that this result follows under Texas law because it would likewise limit the choice of law provision to questions concerning the construction and operation of the contract leaving the Plaintiffs free to advance their claim under North Carolina's DTPA, *Busse v. Pacific Cattle Fund*, 896 S.W.2d 807, 812–13 (Tex.Ct.App.1995); *Thompson & Wallace v. Falconwood Corp.*, 100 F.3d 429, 433 (5th Cir.1996), and also, because the application of Texas' choice of law rules would require the application of North Carolina law to this dispute for the reasons discussed herein.

change for the their franchise royalty fees and that as a result Meineke told its franchisees that the WAC fund was a trust fund which was spent exclusively for the benefit of the franchisees—a fund from which Meineke took no revenue. The Plaintiffs also presented evidence that (among other things) Meineke decided to use that trust fund as a source of revenue and, thereafter, it broke a contract with an advertising firm paid by Meineke to fulfill its obligation to purchase and place advertising (and later paid a settlement of that lawsuit from WAC funds); it then began to purchase and place advertising itself, charging the WAC fund for these efforts (which had previously been rendered at no charge); it chose advertising media designed to maximize the fees it could charge against the WAC fund rather than selecting advertising on the basis of whether it would serve the long-term interest of the chain; it secured large volume discounts for advertising but kept those discounts for itself to the detriment of the WAC fund; and it used WAC funds designed to attract new franchisees as opposed to attracting customers for existing franchisees. The Plaintiffs also presented evidence that the Defendants concealed their misappropriations of WAC funds by false and misleading representations made with intent to deceive. It was this evidence that the jury relied upon when it found for the Plaintiffs on their claims and the Court believes that the jury findings of fraud, breach of fiduciary duty, interference with contract as well as the specific factual findings of the jury with respect to the conduct alleged as deceptive trade practice are supported by the evidence. Those findings, and the factual findings made by the Court below in connection with the Plaintiffs' request for injunctive relief, provide a firm factual basis for the Court's legal determination that the Defendants violated § 75–1.1 in this case, because the practices were unfair, oppressive, and deceptive. *See Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981); *Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980); *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342 (1975).

■ At the hearing held in this matter the Court indicated that conviction to the Plaintiffs and asked the Plaintiffs to elect between punitive or treble damages. At that time, the Plaintiffs argued that they should be allowed to collect both punitive damages and treble damages. Relying on *Medina v. Town and Country Ford*, 85 N.C.App. 650, 355 S.E.2d 831 (1987), the Plaintiffs argue that they should be able to elect an award of punitive damages on some of the claims found by the jury and take treble damages as to other claims because such claims concern discrete conduct and, in such cases, the recovery of punitive damages and treble damages is allowed. The principle cited by the Plaintiffs is correct and it might well have found an application in this case; however, the Plaintiffs did not ask for an instruction under *Medina, supra*, at trial and the Court does not believe that its instruction on the punitive damage issues limited the jury to the consideration of certain specified conduct, *cf. Medina*, 85 N.C.App. at 659, 355 S.E.2d 831. Therefore the Plaintiffs cannot avail themselves of the rule in *Medina* at this time.

When the Plaintiffs learned the Court's disposition on this matter the Plaintiffs elected to receive the award of treble damages available under North Carolina's DTPA albeit under protest. At the Court's questioning they also decided to forego the recovery of damages for unjust enrichment in favor of the recovery of money damages. The Court will reflect those elections in the judgment.

■ The Defendants are not satisfied with these elections. According to the Defendants, the election of remedies requires the Plaintiffs to elect between inconsistent theories—such as aiding and abetting as opposed to the alter ego theory. The Court disagrees because the doctrine, as explained by the North Carolina Supreme Court, is focused on *remedies*, not *theories of liability.*

The North Carolina Supreme Court's decision in *United Laboratories v. Kuykendall*, 335 N.C. 183, 191–92, 437 S.E.2d 374 (1993) both explains the function served by the modern doctrine of election of remedies and illustrates that it applies to remedies, not

theories of liability.[14] In that case, the plaintiff had advanced claims under tort (interference with contract) and the North Carolina DTPA based on the same conduct; and later had elected to take compensatory damages and attorney's fees under the DTPA while taking punitive damages under his tort claim. The North Carolina Supreme Court granted review to determine whether, in a case where tort and deceptive trade practice claims *arose from the same conduct*, a plaintiff could take compensatory damages (and attorney fees) under the DTPA, while electing punitive damages on the tort claim. After explaining that the modern doctrine of election of remedies serves to prevent inconsistent *remedies* which would allow a double recovery (such as suing for rescission as well as breach of contract) and also served to prevent awards of damages that would twice remedy a single wrong, the Supreme Court held that the plaintiff's election was proper.[15]

But, *Kuykendall, supra,* also shows that the doctrine does not apply to theories of liability because the plaintiff was not required to elect between his tort and statutory claim; he was required to elect between overlapping recoveries: the award of compensatory damages under the tort or the statutory claim and the award of punitive or treble damages. Indeed the cases cited by the Defendants recognize as much because they state the commonplace that a Defendant cannot *recover* twice for the same wrong. In short, the Defendants' argument tears the doctrine of election of remedies—a doctrine that has its origins in an older theory of pleading that did not allow plaintiffs to advance alternative claims and was initially addressed to cases where plaintiffs brought two independent suits arising from the same wrong—away from its moorings, i.e. *remedies*. For these reasons, the Court concludes that the doctrine of election of remedies does not require the Plaintiffs to elect between theories of liability.

## IV. REQUEST FOR INJUNCTIVE RELIEF

The Defendants' final set of objections concern the Plaintiffs' request for injunctive relief. Here, the Plaintiffs have made an extremely broad request for injunctive relief in keeping with their view that the releases discussed earlier have a relatively narrow scope. The Defendants argue that the Plaintiffs are not entitled to a permanent injunction under the applicable legal test—in particular because they can always bring suit again at a later date to recover damages. In the alternative the Defendants argue that any injunction must be narrowly tailored to reflect claims that have been waived as a result of various releases as well as new provisions contained in FTAs executed after March of 1995 and the injunction would have to respect Meineke's right to offer new contractual arrangements.

 The Plaintiffs have also requested injunctive relief. The Plaintiffs' motion comes after a seven week jury trial. Based upon the evidence presented at that jury trial the Court finds the following facts.

1. Under the Franchise and Trademark Agreements governing the relationship between Meineke and its franchisees Meineke was obligated to purchase and place advertisement for the benefit of its franchisees in exchange for franchise and licensing fees paid by the franchisee class members.

2. Meineke represented that the Weekly Advertising Account ("WAC") fund created by the FTAs was a trust fund operated solely for the benefit of franchisees and a fund from which Meineke derived no profit.

3. Meineke held itself out as, and was in fact and law, a fiduciary of the franchisees with respect to the WAC fund. Meineke was also the agent of class

---

**14.** The parties both have based their arguments on North Carolina law and the Court agrees that in this diversity case the state law of election of remedies should apply. *See McKinney v. Gannett Co.,* 817 F.2d 659, 671 (10th Cir.1987).

**15.** The Court also held that the award of attorneys fees under the DTPA was not a double recovery so that principle is not a bar to the recovery of fees in this case. As noted at the hearing held on these motions, the Court will defer ruling on this issue until it is fully briefed by the parties.

members for the purpose of administering the WAC fund and purchasing and placing advertising.

4. Meineke breached its FTAs and breached its fiduciary duty to the class members by setting up a corporation called "New Horizons" to purchase and place advertising for the franchisees and then charging additional fees and commissions against the WAC fund for performing tasks it was already obliged to perform under the FTAs.

5. Meineke breached its FTAs and breached its fiduciary duty to the class members by breaking a contract with an advertising firm retained to purchase and place advertising at Meineke's expense and paying monies out of the WAC fund to settle the resulting lawsuit.

6. Meineke, at the direction of Defendant Smythe, breached its FTAs and breached its fiduciary duty to the class members by purchasing and placing advertising based upon whether it generated high fees or recouped commissions for New Horizons rather than its efficacy in promoting sales so as to increase booked profits and bonuses for corporate executives.

7. Meineke breached its FTAs and breached its fiduciary duty to the class members by using WAC funds to pay Meineke's business expenses.

8. Meineke breached its FTAs and breached its fiduciary duty to the class members by taking interest earned on WAC funds for its own benefit.

9. Meineke breached its FTAs and breached its fiduciary duty to the class members by keeping volume discounts on advertising costs for its benefit at the expense of the WAC fund.

10. Meineke breached its FTAs and its fiduciary duty to class members by using WAC funds to purchase advertising designed to attract new franchisees rather than generate business for existing franchisees.

11. Meineke made false and misleading statements to the franchisees with the intent to conceal these practices and the resulting drain on the WAC fund.

12. Meineke's activities were unfair, deceptive, and oppressive such that its practices satisfy the definition of unfair and deceptive trade practices under N.C.G.S. § 76–1.1

13. Meineke's actions have caused significant money damages to class members and will continue to do so unless that action is enjoined.

Based upon these factual findings, the Court believes injunctive relief is appropriate.

■■ The test for entering a permanent injunction is based on the test for granting preliminary injunctive relief with some important alterations. *See Wilson v. CHAMPUS,* 65 F.3d 361, 364 (4th Cir.1995) (*citing Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542). The test for preliminary relief requires the Court to consider: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest. *L.J. v. Massinga,* 838 F.2d 118, 120 (4th Cir.1988). One difference in the treatment of a request for permanent relief is that such a request implicates the a party's actual success on the merits. *See Amoco,* 480 U.S. at 546 n. 12, 107 S.Ct. at 1404 n. 12. Another difference in the treatment of a request for permanent injunctive relief is that the focus on irreparable harm shifts to a focus on whether legal remedies are inadequate. *See e.g. Walgreen Co. v. Sara Creek Property,* 966 F.2d 273, 275 (7th Cir.1992).

The Court finds that the Plaintiffs have made the showing necessary to justify injunctive relief. Here, the Plaintiffs have prevailed in a decisive way on the merits of their claim. The Court believes the jury findings of breach of contract, breach of fiduciary duty, fraud, etc., are well grounded in the evidence and that the Plaintiffs have established the merits of their claim that Meineke breached the FTAs when it charged additional fees for the purchase and placement of

advertising. The Court adopts these jury findings.

The gravamen of the Defendants' objection to injunctive relief is their assertion that the Plaintiffs can always sue again for damages at a later date and these damages are an adequate remedy such that injunctive relief is inappropriate. The Court disagrees. This case is a long-fought class action where the parties have been at odds at every stage of the process. To this day, for example, the Defendants seek decertification of the class. The litigation has created massive costs to the parties; and the necessity of establishing liability and proving damages has been a mammoth undertaking. The case has consumed a tremendous amount of judicial resources as well.

In addition, the Defendants give no consideration to the on-going relationship between the parties. As the Plaintiffs point out, nowhere in the briefing addressing these issues do the Defendants foreswear their prior conduct. From that briefing it appears that the Defendants intend to continue to take fees for the purchase and placement of advertising. Implicitly, the Defendants ask this Court to tolerate a situation where the Plaintiffs are contractually bound to entrust Meineke with their advertising contributions even though the Defendants intend to continue taking funds from that account in a manner that breaches those same contracts.

■ The Court does not believe that the ability of the Plaintiffs to bring another suit in this case is an adequate remedy at law for two basic reasons. First, the Court believes that neither the Plaintiffs or the judicial system should be saddled with a second class action law suit arising from these same facts. The burdens and expense of even the certification process, which would be substantial if this case is any measure, should not be required here. And although the general rule is that such burdens ordinarily will not suffice to make a remedy at law inadequate, in the context of a class action like this one those burdens and expenses become pronounced and are indicate that the remedy at law is inadequate. This exacerbating factor adds additional weight to the common-sense notion that Courts can enjoin breaches of a contract either because they are repeated or because requiring a multiplicity of suits makes an action(s) for damages inadequate. *See e.g. Walgreen Co., supra., Dairy King v. Kraft,* 665 F.Supp. 1181, 1185 (D.Md.1987); *see also* Corbin, Contracts, §§ 1141–42. This seems to be exactly the insight which drove the Eighth Circuits recent decision in *Fogie v. THORN Americas, Inc.,* 95 F.3d 645 (8th Cir.1996); *see also Walgreen Co. v. Sara Creek Property,* 966 F.2d 273, 275 (7th Cir. 1992) (discussing costs of additional suits).

■ The Court believes the remedy at law is inadequate for another reason. Here, the Plaintiffs have presented abundant evidence that Meineke repeatedly told franchisees that the WAC account was a trust fund and that Meineke operated the fund for the benefits of the franchisees. Also, it is clear that Meineke was the agent of the franchisees for the purpose of administering the WAC fund and purchasing and placing advertising for the franchisees such that Meineke owed a duty to them. This persuasive evidence provides another reason why the Court believes a legal remedy is inadequate; insofar as Meineke has characterized the WAC fund as a trust fund, an equitable order requiring Meineke as fiduciary/trustee to perform its obligations seems particularly appropriate. *See e.g.* Corbin on Contracts, § 1155. The on-going agency relationship between the parties also supports this rationale. For all these reasons, the Court concludes that the burdens of additional suits and the need to preserve respect for the *rights of both parties* to the continuing contractual relationship created by the FTAs, a relationship which the *Defendants* have characterized as a fiduciary relationship when addressing their franchisees, combine to make this one of the comparatively rare cases where the recourse to subsequent actions for damages is an inadequate remedy.

■ Finally, the Court concludes that insofar as this case implicates the public interest, that interest militates in favor of the injunction. The public receives a great deal of its goods and services through the franchise system and Meineke provides such goods and services. Absent an injunction,

the franchisee class members would be forced to choose between the continued violation of their franchise contracts—reducing the strength of one of two major players in this market—or terminating the franchise according to its one-sided termination provisions; provisions which prohibit the franchisee for working in this field for some time after the termination. The public interest favors the specific performance of these contracts which provide such services; and it favors enforcing such agreements in an even-handed way so that franchisees are not forced to choose between honoring contracts that are being breached by their franchisor—or choosing some new line of work.

For these reasons, the Court will enjoin the Defendants from taking commissions or fees or otherwise deriving any profit from the WAC fund on account of activities undertaken to purchase and place advertising for those class members who are currently operating Meineke franchises but have not (1) entered Meineke's EDP program, or (2) executed franchise agreements after March 1995. In addition, the Defendants are hereby ordered to keep a separate accounting which will (1) exhaustively categorize any and all payments from the WAC fund, and (2) segregate WAC fund contributions of the class members described above from funds contributed by other Meineke franchisees. The scope of the injunction will be limited to activities directed towards providing advertising for these class members and it will operate only to the extent that class members meet the definition set forth above. The injunction will dissolve, by its nature, when class members drop out of the category identified above.

In closing, the Court notes that it has narrowly tailored the injunction to meet the meritorious objections of the Defendants. At the same time, the Court realizes that in its effort to keep the injunction narrow so that it provides a basis for the parties to continue their contractual relationship, it has not enjoined some of the wrongdoing proven at trial. The Court is willing to trust the Defendants on these other points believing that such abuses will not occur in the future. The Court will rely upon the Plaintiffs to monitor administration of the WAC fund and seek a broader injunction if subsequent events prove this is necessary.

## V. FINALITY

The Defendants argue that the Court cannot render a final decision in this case. *See Stillman v. Travelers,* 88 F.3d 911 (11th Cir. 1996) (decision not final where court did not rule on affirmative defenses); *In Re Lull Corp.,* 52 F.3d 787 (8th Cir.1995) (decision leaving open set-off is not final); *City of New York v. Exxon,* 932 F.2d 1020 (2nd Cir.1991) (decision granting summary judgment not final where affirmative defense and damages were yet to be considered). The Court disagrees.

Although most final decisions leave nothing for the Court to do except execute on a judgment, the Supreme Court has reiterated that "[a] question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order." *Budinich v. Becton Dickinson and Company,* 486 U.S. 196, 199, 108 S.Ct. 1717, 1720, 100 L.Ed.2d 178 (1988). In that case, the Court held that an outstanding fee petition did not render a decision interlocutory employing a "practical approach to the matter" and reasoning that such a result did not undermine the interests that § 1291 was designed to protect—non-interference with ongoing proceedings, allowing trial judge's an opportunity to reconsider their positions, the avoidance of piecemeal litigation. *Budinich,* 486 U.S. at 198–200, 202–03, 108 S.Ct. at 1720, 1722.

In *Budinich, supra,* the Court relied on *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), where the Supreme Court, after emphasizing that "[a] pragmatic approach to the question of finality has been considered essential to the achievement of the 'just, speedy, and inexpensive determination of every action' ", *id.* at 306, 82 S.Ct. at 1513, held that a district court decision holding a merger violative of the Clayton Act, ordering the defendant to divest itself of stock in another corporation, and permanently enjoining the defendant from acquiring or having any further busi-

ness in any of its codefendant was a final decision even though the district court's decision left open the precise method whereby the defendant should be required to divest certain holdings and the district court would be required to supervise the plan of divestiture which it adopted. *See Brown,* 370 U.S. at 307–08, 82 S.Ct. at 1514. The Court noted that the district court's order passed upon every prayer for relief and enjoined the violations of the Clayton Act such that "[f]urther rulings of the District Court in administering its decree . . . are sufficiently independent of, and subordinate to, the issues presented by this appeal to make the case in its present posture a proper one for review now" *id.,* and under these circumstances, the Court reasoned, "[r]epetitive judicial consideration of the same question in a single suit will not occur here." *Brown,* 370 U.S. at 309, 82 S.Ct. at 1515.[16] The Supreme Court also reasoned that the district court's decision was final even though the details of the divestiture plan which the District Court would approve were uncertain because any such plan would not affect the outcome of the basic litigation in this case. *See Brown,* 370 U.S. at 309 n. 15, 82 S.Ct. at 1514 n. 15.

The Seventh Circuit employed a similar analysis in *Parks v. Pavkovic,* 753 F.2d 1397 (7th Cir.1984), a class action case similar to the one at bar. In *Parks* the district court rendered a decision permanently enjoining the state from requiring parents to pay certain costs for educating their children, it ordered the state to reimburse those parents for such costs since 1978 although it did not determine the amount of reimbursement (which at the time of oral argument was estimated to be between $1.5 million and $3 million), and it certified its decision as a final judgment under Fed.R.Civ.P. 54(b). After noting the general rule that an order that leaves the determination of damages to a future proceeding is not final, the Court noted that such a decision is sufficiently final "if the determination of damages will be mechanical and uncontroversial", so that the issues presented in the appeal are "very unlikely to be mooted or altered" by the dam-

age computation then an immediate appeal is allowed "[f]or if the further proceedings in the trial court are quite unlikely to make the appeal moot or even affect the issues on appeal, there is no reason to delay the appeal while they are resolved; and the delay may be a source of cost." *Parks,* 753 F.2d at 1401–02. Applying this test the Court concluded that "[a]lthough computing the money owed each class member is not automatic, it is mechanical, is unlikely to engender dispute or controversy, and will require no analytic or judgmental determinations that might affect the questions now before us or give rise to other appealable questions" because even in the "unlikely event that any appealable issues arise in computing each class member's entitlement to damages, they will not be factually similar to those raised by the present appeal, so there will be no judicial diseconomy if they are considered in a separate appeal." *Parks,* 753 F.2d at 1402.

Thus, the Seventh Circuit viewed the decision as sufficiently final, even though it did not set the total damages or formula for apportioning damages, on the theory that the process was unlikely to produce an appeal which would affect any issues then before the court. And other cases have recognized that under similar circumstances the need to perform certain simple and independent functions in order to calculate damages or wrap up peripheral matters does not prevent a decision on the merits from being properly characterized as final. *See Griffin v. Michigan Department of Corrections,* 5 F.3d 186, 190–91 (6th Cir.1993) (district court order in 1988 awarding plaintiff additional pay and promotions pegged to comparative male and remanding to special master to handle remaining evidentiary hearings, conduct damage calculations, and monitor progress of parties was a final decision because substantive legal issues of claim were determined and remaining tasks were merely ministerial); *Fiataruolo v. U.S.,* 8 F.3d 930, 936–37 (2nd Cir.1993) (district court decision ordering government to refund all monies held in full or partial satisfaction of the penalties

---

**16.** The Court also relied upon the fact that the Defendants were being required to keep separate books *pendente lite, Brown,* 370 U.S. at 307–08, 82 S.Ct. at 1514, something that the Defendants are required to do in this case.

assessed against the plaintiffs plus interest from the date of payment was a final order even though it did not specify amount due where judgment on its face demonstrate that court had fully adjudicated all the issues before it leaving nothing remaining for it to do with respect to the litigation).

The Court believes that its decision in this case is properly characterized as a "final" decision within the meaning of 28 U.S.C. § 1291. As in *Brown, supra,* the jury verdict has ruled on every claim for relief and the jury or this Court has adjudicated every defense that is properly before the Court. Thus, the Court believes that the Defendants' reliance upon *Stillman v. Travelers,* 88 F.3d 911 (11th Cir.1996) (decision not final where court did not rule on affirmative defenses); *In Re Lull Corp.,* 52 F.3d 787 (8th Cir.1995) (decision leaving open set-off is not final); *City of New York v. Exxon,* 932 F.2d 1020 (2nd Cir.1991) (decision granting summary judgment not final where affirmative defense and damages were yet to be considered), is mistaken. In those cases, district court decisions were not final because the decisions were rendered before an affirmative defense was decided on its merits or before damages were determined.

But that is not true here. In this case, the Court has held a seven week jury trial in this class action and the jury has rendered a verdict that the Defendants are liable to the Plaintiffs on numerous counts, it has determined that damage caused by that wrongdoing, and the jury or the Court has treated the defenses properly raised by the Defendants. Thus, this is not a case where there are defenses to determine or damages remain to be assessed, precisely because the jury has rejected the Plaintiffs' challenges to the releases and the jury has determined the damages caused by the Defendants, the Defendants' defenses have been adjudicated, and the effect of those releases is reflected in the damage formula adopted by the Court.

All that remains in this case is for the allocation of damages to individual class members in light of the formula adopted by the Court, deduction of released claims from the damage award as set forth in the judgment, and for Meineke to show that it conferred the benefits of the EDP program on those forty or so (of over 900) class members noted earlier—a process more akin to a proof of claim. These are simple tasks that do not implicate the merits of the jury's decision on the merits. The Defendants argue that the Court will still be forced to review the allocations made by the special master and review its determinations on the EDP release issues still before it. Assuming this is true, any disputes arising from these matters will concern either a few idiosyncratic cases that simply do not implicate in the least the merits of the class action or allocation-related issues totally independent of the merits of the underlying claim.

Thus, the Court believes that this case is one like *Brown* and *Parks supra,* where any further orders of this Court will not affect the basic outcome of the case and further rulings of this Court will be so independent of the issues presented on any appeal that repetitive judicial consideration of the same questions will not occur. As a result, the Court believes that this is a case where "a question remaining to be decided after an order ending litigation on the merits" does not prevent the finality of its resolution because any subsequent order "will not alter the order or moot or revise the decisions embodied in the order." *See Budinich,* 486 U.S. at 199, 108 S.Ct. at 1720.

The presence of injunctive relief in this case strengthens the Court's conviction. Here, the Plaintiffs have requested injunctive relief and the Court has decided that such relief is appropriate. The Court believes that its order is justified by the jury verdict and tailored to suit the competing interests of the parties. But the order is not wholly consistent with the wishes of either party and given the way this case has been litigated so far the Court expects that both parties will appeal from the injunction. Any such appeal will implicate the jury's determination of liability for the Court's findings arise from the same evidence and track the jury verdict. As a result, the Court of Appeals is likely to consider many of the same issues that will be raised in any subsequent appeal. For all these reasons, the Court believes that its decision is final.

 The Court also concludes that certification of the judgment under Fed.R.Civ.P. 54(b) is appropriate because there is no just reason for delay. For one thing, the Court notes that the Defendants have violated the FTAs now for 10 years and the class members have been seriously damaged as a result. These class members should not be forced to wait for the resolution of the remaining peripheral issues before judgment can enter. Indeed the evidence at trial shows that some franchisees went out of business because of inadequate advertising and the Court's concern for their solvency militates in favor of the prompt resolution of this dispute. The Defendants argue that judgment should not enter until allocation and deduction are complete so that the markets can accurately appraise their potential liability; but the marketplace typically values such contingent liabilities when necessary. Similarly, in this case the parties both agree that the allocation process required by the Court's Order will be straightforward so that process can be completed as soon as possible. The judgment formula takes into account the effect of released claims such that there does not remain any outstanding set-off or counterclaim that would further affect the judgment in this case, and the remaining issues do not threaten to moot the appeal or call for the reconsideration of matters previously reviewed. For these reasons, the Clerk will be directed to enter the judgment prepared by the Court at this time.

## JUDGMENT

This action, certified as a class action on May 11, 1995, on behalf of the class consisting of all persons or entities throughout the United States that were Meineke franchisees operating at any time during or after May of 1986, came on for trial before this Court and a jury on November 6, 1996, and the issues having been tried and the jury having duly rendered its verdict as follows:

1. Did the Defendant Meineke breach its Franchise and Trademark Agreement contracts with the Plaintiffs?

 ANSWER: _X_ [YES] ___ [NO]

2. Was Meineke or New Horizons Advertising, Inc. (hereinafter "New Horizons") a fiduciary of the Plaintiffs with respect to the Weekly Advertising Contributions ("WAC") advertising fund?

 A. Meineke

 ANSWER: _X_ [YES] ___ [NO]

 B. New Horizons

 ANSWER: _X_ [YES] ___ [NO]

[IF YOU ANSWERED ISSUE 2 "NO," DO NOT ANSWER ISSUE 3.1]

3. If you have answered Issue 2 "YES," then did Meineke or New Horizons breach its fiduciary duty to Plaintiffs?

 ANSWER: _X_ [YES] ___ [NO]

[IF YOU ANSWERED ISSUE 3 "NO," DO NOT ANSWER ISSUE 4.]

4. If you have answered Issue 3 "YES," then did any of the following Defendants aid and abet Meineke or New Horizons in the breach of its fiduciary duty to the Plaintiffs?

 A. New Horizons Advertising, Inc. (hereinafter "New Horizons")

 ANSWER: _X_ [YES] ___ [NO]

B. GKN Parts Industries Corp. (hereinafter "PIC")

ANSWER: _X_ [YES] ___ [NO]

C. GKN, PLC.

ANSWER: _X_ [YES] ___ [NO]

D. Ronald Smythe

ANSWER: _X_ [YES] ___ [NO]

E. Gene Zhiss

ANSWER: _X_ [YES] ___ [NO]

F. Ted Pearce

ANSWER: _X_ [YES] ___ [NO]

5. Did any of the following named Defendants commit fraud on the Plaintiffs?

A. Meineke

ANSWER: _X_ [YES] ___ [NO]

B. New Horizons

ANSWER: _X_ [YES] ___ [NO]

C. PIC

ANSWER: _X_ [YES] ___ [NO]

D. GKN, PLC.

ANSWER: _X_ [YES] ___ [NO]

E. Ronald Smythe

ANSWER: _X_ [YES] ___ [NO]

F. Gene Zhiss

ANSWER: _X_ [YES] ___ [NO]

G. Ted Pearce

ANSWER: _X_ [YES] ___ [NO]

6. Did any of the following named Defendants intentionally interfere with:

(a) actual contractual relations between Plaintiffs and Meineke; or

(b) prospective contractual relations between Plaintiffs and third parties such as their customers or potential advertising services?

A. New Horizons

**ANSWER: 6(a)** _X_ [YES] ___ [NO]

**ANSWER: 6(b)** ___ [YES] _X_ [NO]

B. PIC

**ANSWER: 6(a)** _X_ [YES] ___ [NO]

**ANSWER: 6(b)** ___ [YES] _X_ [NO]

C. GKN, PLC.

**ANSWER: 6(a)** _X_ [YES] ___ [NO]

**ANSWER: 6(b)** ___ [YES] _X_ [NO]

D. Ronald Smythe

**ANSWER: 6(a)** _X_ [YES] ___ [NO]

**ANSWER: 6(b)** ___ [YES] _X_ [NO]

E. Gene Zhiss

**ANSWER: 6(a)** _X_ [YES] ___ [NO]

**ANSWER: 6(b)** ___ [YES] _X_ [NO]

F. Ted Pearce

**ANSWER: 6(a)** _X_ [YES] ___ [NO]

**ANSWER: 6(b)** ___ [YES] _X_ [NO]

7. Did any of the following named Defendants engage in the conduct that the Plaintiffs allege to be unfair and deceptive trade practices under the North Carolina Unfair Trade Practices Act?

A. Meineke

**ANSWER:** _X_ [YES] ___ [NO]

B. New Horizons

**ANSWER:** _X_ [YES] ___ [NO]

C. PIC

**ANSWER:** _X_ [YES] ___ [NO]

D. GKN, PLC.

**ANSWER:** _X_ [YES] ___ [NO]

**1116**

E. Ronald Smythe

**ANSWER:** _X_ [YES] ___ [NO]

F. Gene Zhiss

**ANSWER:** _X_ [YES] ___ [NO]

G. Ted Pearce

**ANSWER:** _X_ [YES] ___ [NO]

**[IF YOU HAVE ANSWERED ISSUE 7 "NO" AS TO ALL NAMED DEFENDANTS, DO NOT ANSWER ISSUES 8 AND 9.]**

8. If you have answered issue 7 "YES" as to any named Defendant, were the unfair and deceptive trade practices of any of the following named Defendant(s) in commerce in North Carolina or did they "affect commerce" in North Carolina?

A. Meineke

**ANSWER:** _X_ [YES] ___ [NO]

B. New Horizons

**ANSWER:** _X_ [YES] ___ [NO]

C. PIC

**ANSWER:** _X_ [YES] ___ [NO]

D. GKN, PLC.

**ANSWER:** _X_ [YES] ___ [NO]

E. Ronald Smythe

**ANSWER:** _X_ [YES] ___ [NO]

F. Gene Zhiss

**ANSWER:** _X_ [YES] ___ [NO]

G. Ted Pearce

**ANSWER:** _X_ [YES] ___ [NO]

9. If you have answered both Issues 7 and 8 "YES" as to any Defendant, then was the Defendant[s]' conduct a proximate cause of any injury to Plaintiffs?

A. Meineke

**ANSWER:** _X_ [YES] ___ [NO]

B. New Horizons

**ANSWER:** _X_ [YES] ___ [NO]

C. PIC

ANSWER: _X_ [YES] ___ [NO]

D. GKN, PLC.

ANSWER: _X_ [YES] ___ [NO]

E. Ronald Smythe

ANSWER: _X_ [YES] ___ [NO]

F. Gene Zhiss

ANSWER: _X_ [YES] ___ [NO]

G. Ted Pearce

ANSWER: _X_ [YES] ___ [NO]

10. Did any of the following named Defendants violate the Texas Unfair and Deceptive Trade Practices Act?

A. Meineke

ANSWER: _X_ [YES] ___ [NO]

B. New Horizons

ANSWER: ___ [YES] _X_ [NO]

C. PIC

ANSWER: _X_ [YES] ___ [NO]

D. GKN, PLC.

ANSWER: _X_ [YES] ___ [NO]

E. Ronald Smythe

ANSWER: _X_ [YES] ___ [NO]

F. Gene Zhiss

ANSWER: _X_ [YES] ___ [NO]

G. Ted Pearce

ANSWER: _X_ [YES] ___ [NO]

11. (a) If you answered Issue 2 "YES" as to Meineke or New Horizons, were any of the following Defendants negligent in performance of any fiduciary duty in their administration of the WAC fund?

A. Meineke

ANSWER: _X_ [YES] ___ [NO]

B. New Horizons

**ANSWER:** _X_ [YES] ___ [NO]

(b) If you answered Issue 11(a) "YES" as to Meineke or New Horizons, then was such negligence accompanied by willful or wanton conduct'?

A. Meineke

**ANSWER:** _X_ [YES] ___ [NO]

B. New Horizons

**ANSWER:** _X_ [YES] . ___ [NO]

12. Are any of the following Defendants liable to Plaintiffs for negligent misrepresentations?

A. Meineke

**ANSWER:** _X_ [YES] ___ [NO]

B. New Horizons

**ANSWER:** _X_ [YES] ___ [NO]

C. PIC

**ANSWER:** _X_ [YES] ___ [NO]

D. GKN, PLC.

**ANSWER:** _X_ [YES] ___ [NO]

E. Ronald Smythe

**ANSWER:** _X_ [YES] ___ [NO]

F. Gene Zhiss

**ANSWER:** _X_ [YES] ___ [NO]

G. Ted Pearce

**ANSWER:** _X_ [YES] ___ [NO]

13. Was New Horizons the mere instrumentality of the following Defendant(s) during the time the Plaintiffs' claims arose?

A. Meineke

**ANSWER:** _X_ [YES] ___ [NO]

B. GKN, PLC

**ANSWER:** _X_ [YES] ___ [NO]

C. PIC

**ANSWER:** _X_ [YES] ___ [NO]

14. Was Meineke the mere instrumentality of the following Defendant(s) during the time the Plaintiffs' claims arose?

A. PIC

**ANSWER:** _X_ [YES] ___ [NO]

B. GKN, PLC.

**ANSWER:** _X_ [YES] ___ [NO]

15. Was PIC the mere instrumentality of GKN during the time Plaintiffs' claims arose?

**ANSWER:** _X_ [YES] ___ [NO]

16. Was Defendant Meineke unjustly enriched as a result of breach of fiduciary duty to Plaintiffs?

**ANSWER:** _X_ [YES] ___ [NO]

17. (a) Were any of the following named Defendants unjustly enriched?

A. New Horizons

**ANSWER:** _X_ [YES] ___ [NO]

B. PIC

**ANSWER:** ___ [YES] _X_ [NO]

C. GKN, PLC.

**ANSWER:** ___ [YES] _X_ [NO]

D. Ronald Smythe

**ANSWER:** ___ [YES] _X_ [NO]

E. Gene Zhiss

**ANSWER:** ___ [YES] _X_ [NO]

F. Ted Pearce

**ANSWER:** ___ [YES] _X_ [NO]

18. Are any of the Plaintiffs' claims barred by the Statute of Limitations? [NOTE: ANSWER ONLY A–1 OR A–2, NOT BOTH.]

A–1 Breach of fiduciary duty (3 Years)

**ANSWER:** ___ [YES] ___ [NO]

A–2. Breach of fiduciary duty if you find the breach of fiduciary duty constitutes constructive fraud (10 Years)

ANSWER: ____ [YES] _X_ [NO]

B. Breach of Contract (3 Years)

ANSWER: ____ [YES] _X_ [NO]

C. Fraud (3 Years)

ANSWER: ____ [YES] _X_ [NO]

D. Negligent misrepresentation (3 Years)

ANSWER: ____ [YES] _X_ [NO]

E. Aiding and Abetting breach of fiduciary duty (3 Years)

ANSWER: ____ [YES] _X_ [NO]

F. North Carolina Unfair Trade Practices Act (4 Years)

ANSWER: ____ [YES] _X_ [NO]

G. Negligence (3 Years)

ANSWER: ____ [YES] _X_ [NO]

H. Intentional interference with contractual relations (3 Years)

ANSWER: ____ [YES] ____ [NO]

I. Unjust enrichment (3 Years, but if you find the claim for unjust enrichment arises from a breach of fiduciary duty, it is 10 Years) [NOTE: ANSWER ONLY I–1 OR I–2, NOT BOTH.]

1–1. 3 Years

ANSWER: ____ [YES] ____ [NO]

1–2. 10 Years

ANSWER: ____ [YES] _X_ [NO]

J. Texas Unfair and Deceptive Trade Practices Act (2 Years)

ANSWER: ____ [YES] _X_ [NO]

19. (a) Was any delay on the part of the Plaintiffs in asserting their claims caused by their reasonable reliance on a Defendant who was a fiduciary and in the absence of actual knowledge on the part of the Plaintiffs?

ANSWER: _X_ [YES] ____ [NO]

(b) Was any delay on the part of the Plaintiffs in asserting their claims caused by the fraudulent concealment on the part of a Defendant and in the absence of actual knowledge on the part of the Plaintiffs?

ANSWER: _X_ [YES] ___ [NO]

20. Were the actions alleged by the Plaintiffs a related series of on-going violations of their rights?

ANSWER: _X_ [YES] ___ [NO]

21. Were the releases procured in connection with the Enhanced Dealer Program procured through fraud, duress, or undue influence?

ANSWER: ___ [YES] _X_ [NO]

[IF YOU ANSWER THIS ISSUE "NO," DO NOT ANSWER THE NEXT ISSUE.]

22. If you answered Issue 21 "YES," then do you find that the class members ratified the releases by their words or actions?

ANSWER: ___ [YES] ___ [NO]

23. Were any releases other than EDP procured through fraud, duress, or undue influence?

ANSWER: ___ [YES] _X_ [NO]

24. If you answered Issue 23 "YES," then do you find that the class members ratified the releases by words or actions?

ANSWER: ___ [YES] ___ [NO]

25. Compensatory Damages: If you answered any of Issues 1, 3, 4, 5, 17, 6, 7, 10, 11, or 12 (breach of contract, breach of fiduciary duty, aid and abetting breach of fiduciary duty, fraud, unjust enrichment, intentional interference with contractual relations, unfair and deceptive trade practices, negligence, or negligent misrepresentation) "YES," then you must calculate the amount, if any, of compensatory damages.

(a) What total amount of compensatory damages, if any, are the Plaintiffs' entitled to recover?

NOTE: Regardless of releases, calculate damages as if all the class members are entitled to compensatory damages.

### ANSWER $196,956,596

(b) How much of the amount listed in 25(a) was interest?

### ANSWER $75,423,369

(c) If you answered 25(a) in any amount, AND you found that the Defendants breached a fiduciary duty, how much of the total amount of compensatory damages listed in 25(a) were commissions improperly received or monies improperly expended or improperly retained by the Defendants as personal gain or profit that were a proximate result of the Defendants' breach of a fiduciary duty owed to the Plaintiffs?

### ANSWER $51,483,622

(d) How much of the amount listed in 25(c) was interest?

### ANSWER $20,421,807

26. If you have answered Issue 25(a) in any amount AND ANY of the following Issues "YES": aiding and abetting, breach of fiduciary duty, fraud, intentional interference with contractual relations, negligence (and that such negligence was of a willful and wanton character, Issue 1 1(b)), then do you find that any of the following Defendants are liable for punitive damages, and if you answer "YES" as to any Defendant, what amount?

A. Meineke

ANSWER: _X_ [YES] ___ [NO]

AMOUNT: $ 70,000,000

B. New Horizons

ANSWER: _X_ [YES] ___ [NO]

AMOUNT: $ 7,000,000

C. PIC

ANSWER: _X_ [YES] ___ [NO]

AMOUNT: $1,800,000,000

D. GKN, PLC.

ANSWER: _X_ [YES] ___ [NO]

AMOUNT: $ 70,000,000

E. Ronald Smythe

ANSWER: _X_ [YES] ___ [NO]

AMOUNT: $ 1,000,000

F. Gene Zhiss

ANSWER: _X_ [YES] ___ [NO]

AMOUNT: $ 100,000

G. Ted Pearce

ANSWER: _X_ [YES] ___ [NO]

AMOUNT: $ 100,000

**TOTAL AMOUNT: $ *150,000,000***

27. If you answered "YES" as to any Defendant in Issues 16 or 17, then you must determine in what amount the Defendants listed in Issues 16 & 17 were unjustly enriched.

A. Meineke

ANSWER: $15,590,268

B. New Horizons

ANSWER: $ 2,600,000

C. PIC

ANSWER: $ –0–

D. GKN, PLC.

ANSWER: $ –0–

E. Ronald Smythe

ANSWER: $ –0–

F. Gene Zhiss

ANSWER: $ –0–

G. Ted Pearce

ANSWER: $ –0–

NOW, THEREFORE, IT IS ORDERED AND ADJUDGED that in accordance with the Memorandum of Decision filed simultaneously herewith and the factual findings of the jury that the Defendants, in the management and administration of the Meineke Weekly Advertising Contribution Fund (WAC Fund) and the franchisee advertising program, engaged in the conduct alleged to be unfair and deceptive trade practice, the finding by the jury that such conduct by the Defendants was in commerce in North Carolina or did affect commerce in North Carolina, and the finding by the jury that such conduct by Defendants was a proximate cause of injury to Plaintiffs, the Court hereby finds and concludes, as a matter of law, that Defendants engaged in unfair and deceptive trade practices in commerce in North Carolina or affecting commerce in North Carolina in violation of the North Carolina Unfair Trade Practices Act, N.C.Gen.Stat. § 75–1.1 *et seq.*

THEREFORE, IT IS ORDERED AND ADJUDGED that the Plaintiffs have and recover treble the jury's verdict in an amount of FIVE HUNDRED NINETY MILLION, EIGHT HUNDRED SIXTY–NINE THOUSAND, SEVEN HUNDRED AND EIGHTY–EIGHT AND NO/100 ($590,869,-788.00) DOLLARS plus interest thereon at the rate of *5.67%* per annum as provided by law from the date this Judgment is filed, and the costs of this action allocated and adjusted according to the following formula.

$$\text{Individual Class Member's Allocation} = \frac{\text{Individual Class Member's WAC Contributions}}{\text{Total WAC Contributions From Eligible Franchisees}} \quad X \quad \frac{\text{Total WAC Contributions From Eligible Franchisees}}{\text{Total WAC Contributions From All Franchisees}} \quad X \quad \text{Total Classwide Damages (Unadjusted for Releases)}$$

The determination of "Individual Class Member's WAC Contributions" and "Total WAC Contributions From All Franchisees" shall be made pursuant to the Defendants' records. In determining the value of claims attributable to "Eligible Franchisees" for the purpose of calculating the total damages for which each Defendant is liable, the amount of damages will be reduced as to each Defendant by the value of claims from which each Defendant was released; and the determination as to the value of claims from which each Defendant was released shall be made pursuant to, and consistent with, the Memorandum of Decision filed simultaneously herewith.

**IT IS FURTHER ORDERED** that the Plaintiffs shall have and recover interest on the amount of the Judgment provided for in N.C.Gen.Stat. § 24–5 at the rate of *8% percent* per annum from the date of the jury's verdict, December 18, 1996 until the date of this Judgment.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Plaintiffs' request for permanent injunctive relief pursuant to Fed. R.Civ.P. 65 is *GRANTED* in accordance with and for the reasons set forth in this Court's Memorandum of Decision filed simultaneously with this Judgment.

The Defendants, their officers, agents, servants, employees, and attorneys are enjoined from taking commissions or fees or otherwise deriving any profit from the WAC Fund on account of activities undertaken to purchase and place advertising for those class members who are currently operating Meineke franchises but have not (1) entered Meineke's EDP program, or (2) executed franchise agreements after March 1995.

The Defendants are further enjoined to keep a separate accounting which will (1) exhaustively categorize any and all payments from the WAC Fund, and (2) segregate the WAC Fund contributions of the class members described above from funds contributed by other Meineke franchisees. The scope of the injunction is limited to activities directed towards providing advertising for those class members and will operate to the extent that class members meet the definitions set out above. The injunction will dissolve by its nature, when class members drop out of the category identified above.